UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SALENA GLENN,

                Plaintiff,                          CIVIL ACTION NO. 12-11433

        v.                                          DISTRICT JUDGE THOMAS L. LUDINGTON

                                                    MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 14, 18)**

Plaintiff Salena Glenn challenges the Commissioner of Social Security's ("the

Commissioner") final denial of her benefits application.  Cross motions for summary judgment

are pending (Dkt. Nos. 14, 18).  Plaintiff also filed a response (Dkt. No. 19).  Judge Thomas L.

Ludington referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt.

No. 3).

**I.      RECOMMENDATION**

Because the Administrate Law Judge's ("ALJ") determination that Plaintiff was not

disabled is not supported by substantial evidence, this Magistrate Judge **RECOMMENDS** that

Plaintiff's motion for summary judgment be **GRANTED**, the Commissioner's motion for

summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner.

**II.     DISCUSSION**

        **A.      *Framework for Disability Determinations***

Under the Social Security Act, (the "Act") Disability Insurance Benefits and

Supplemental Security Income are available only for those who have a "disability."  *See Colvin*

*v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**B.     Standard of Review**

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *See*

*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility."  *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

## III.   REPORT

### A.   *Administrative Proceedings*

Plaintiff applied for supplemental security disability income and disability insurance benefits on August 14, 2008, alleging she became disabled on March 28, 2007 (Tr. 14).  After the Commissioner initially denied Plaintiff's application, she appeared without counsel for a hearing before ALJ Curtis R. Boren, who considered the case *de novo*.[1]  In a written decision, the ALJ found Plaintiff was not disabled (Tr. 14-23).  Plaintiff requested an Appeals Council review (Tr. 7).  On February 9, 2012, the ALJ's findings became the Commissioner's final administrative decision when the Appeals Council declined further review (Tr. 1-3).

### B.   *ALJ Findings*

Plaintiff completed some college and has past relevant work as production worker, certified nursing assistant, assembly line worker and group home worker (Tr. 21, 35).  The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that she had not engaged in substantial gainful activity since her disability onset date in March of 2007 (Tr. 16).

---

[1]Plaintiff is now represented by counsel.

At step two, the ALJ found that Plaintiff had the following "severe" impairments: degenerative disc disease,[2] neck pain, left shoulder tendinitis,[3] history of closed head injury, post-traumatic headaches, and major depression (Tr. 16).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 17).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> light work . . . except [Plaintiff] can reach overhead or above shoulder level with her left upper extremity no more than occasionally and [Plaintiff] is moderately limited in her ability to understand, remember and carry out detailed instructions[;] to maintain attention and concentration for extended periods[;] and to interact appropriately with the general public. [Plaintiff] can understand, remember and carry-out simple tasks with no limitations.

(Tr. 18).

At step four, the ALJ found that Plaintiff could not perform her past relevant work as a production worker, certified nursing assistant, assembly line worker or group home worker (Tr. 21).

At step five, the ALJ found Plaintiff was not disabled, because there are a significant number of jobs available in the national economy that Plaintiff could perform (Tr. 22).

---

[2]"Degenerative disc disease is a spinal condition caused by the breakdown of [the] intervertebral discs." *See* http://www.mayfieldclinic.com/PE-DDD.htm (last visited June 11, 2013).

[3]"Tendinitis is inflammation or irritation of a tendon." *See* http://www.mayoclinic.com/health/tendinitis/DS00153 (last visited June 11, 2013).

### C.     Administrative Record

#### 1.     Plaintiff's Hearing Testimony and Statements

Plaintiff's impairments stem from a March 28, 2007 car accident (Tr. 38, 198). Plaintiff testified that she has headaches that make her feel like she is going to die, constant neck and back pain, trouble with her memory, problems with her shoulder, and cysts around her vulva which occasionally prevent her from walking and require extra bathroom breaks (Tr. 38-39, 42, 44, 49-50). To manage the pain, Plaintiff took a pain management class and exercises (Tr. 38). She uses a walker when her pain becomes unbearable (Tr. 44-45).

Plaintiff testified that she can rotate her neck and do household chores for short periods of time (Tr. 39, 47).

#### 2.     Relevant Medical Evidence

##### a.     Cysts Around Plaintiff's Vulva

On January 12, 2007 and March 16, 2007, Plaintiff complained of cysts around her vulva (Tr. 285, 294). Lisa A. Manz-Dulac, M.D. diagnosed Plaintiff with hidradenitis suppurativa[4] on January 23, 2007 (Tr. 290).

On February 27, 2007, Sudha Chakravarty, M.D., opined that Plaintiff may need to use the restroom frequently and take 1-2 days off work per month (if her cysts flare up) (Tr. 473-474).

Plaintiff's condition prevented her from working between February 27, 2007 and March 29, 2007 (Tr. 469-470).

---

[4]"Hidradenitis suppurativa . . . is a chronic skin condition that features pea-sized to marble-sized lumps under the skin." *See* http://www.mayoclinic.com/health/hidradenitis-suppurative/DS00818 (last visited June 11, 2013).

On March 27, 2007, Veena B. Chari-Hedni, M.D., opined that Plaintiff could return to work, but she needed extra breaks for medical reasons (Tr. 472).

In a letter dated April 23, 2008, Richard J. Ferrara, Jr., M.D., indicated that Plaintiff was seen in his office on April 14, 2008 for hidradenitis suppurativa, and "[t]reatment options were discussed[.]" Plaintiff was to return in six months (or earlier, if needed) (Tr. 351).

On July 29, 2010, Plaintiff reported that the hidradenitis suppurativa was inflamed due to stress (Tr. 463).

### b. Plaintiff's Neck, Back, and Shoulder Pain

On February 27, 2007, Plaintiff complained of pain in her shoulder (Tr. 292). While radiographs of Plaintiff's shoulders were normal, an MRI of Plaintiff's left shoulder three months later revealed possible tendinitis (Tr. 224, 293).

On June 6, 2007, Plaintiff began treatment with John C. Pollina, M.D. Plaintiff reported pain in her left shoulder and lower back. Her pain decreased with medication and hot baths; it increased when she raised her arm above her head, walked or stood up. On examination, Plaintiff had full range of motion in her neck, but she was moderately restricted in her lumbar range of motion. She could only abduct her left shoulder to 90 degrees[5] and bend forward 110 degrees. Dr. Pollina diagnosed Plaintiff with left rotator cuff tendinitis and left lumbar strain. She recommended that Plaintiff not return to work for four weeks (Tr. 258-259).

On June 21, 2007, Plaintiff treated with Yi C. Sul, M.D. Plaintiff complained of neck, left shoulder, and lower back pain which increased with activity. Plaintiff had a slow gait, but did not need a walking aid (Tr. 231-232).

---

[5]Shoulder abduction is a lateral movement away from the midline of the body. *See* http://www.exrx.net/Articulations/Shoulder.html (last visited June 12, 2013).

On June 26, 2007, an MRI of Plaintiff's lumbar spine was negative (Tr. 281).  An EEG performed by Dr. Sul on June 30, 2007 was also normal (Tr. 216).

On July 9, 2007, an examination of Plaintiff's neck and lumbar spine revealed muscle spasms (mostly on the left side) and restricted range of motion.  David M. Katz, D.C. diagnosed Plaintiff with: (1) cervical, thoracic and lumbar sprain; and (2) left side cervical and lumbar radiculitis[6] and radiculopathy.[7]  He found that "[Plaintiff was] completely disabled . . . from returning to her work [on] the production line" and recommended "[n]o physical activity, no lifting over 10 [pounds,] [and] [n]o repetitive bending, pushing, pulling, prolonged sitting or standing, squatting, or reaching overhead."  Dr. Katz also restricted Plaintiff from "physical activity at home and taking care of her children[.]" (Tr. 199-200).

On July 12, 2007, Plaintiff had restricted range of motion in her spine (Tr. 192).  Approximately two weeks later, Plaintiff reported trouble walking and performing functional activities (Tr. 277).

On August 2, 2007, Plaintiff reported improvement in her left shoulder, neck, and lower back pain.  But, she was still mildly restricted in her lumbar range of motion and in her ability to abduct and rotate her left shoulder; she did have full range of motion in her cervical and thoracic spine (Tr. 257).

On August 29, 2007, Plaintiff reported pain in her neck, upper and lower back, and left shoulder.  Dr. Pollina indicated that Plaintiff: (1) moved slowly; (2) was mild-to-moderately limited in her ability to abduct and rotate her right shoulder; and (3) had restricted range of

---

[6]Radiculitis is the inflammation of the root of a spinal nerve, especially the portion of the root that lies between the spinal cord and the intervertebral canal.  *See Dorlands Illustrated Medical Dictionary*, 1595 (31st Ed. 2007).

[7]Radiculopathy is a disease of the nerve roots.  *See Dorlands Illustrated Medical Dictionary*, 1595 (31st Ed. 2007).

motion in her lumbar spine.  Plaintiff had full range of motion in her neck.  Dr. Pollina diagnosed

Plaintiff with: (1) left shoulder tendinitis; and (2) cervical, thoracic, and lumbar myofascitis.[8]

She recommended that Plaintiff not return to work for an additional six weeks (Tr. 255-256).

Edward J. Dailey, D.C. diagnosed Plaintiff with spondylosis of the cervical spine,[9] and

slightly reduced disc spacing in the lumbar spine.  There was no evidence of acute fracture,

dislocation, or aggressive pathology in her cervical, lumbar or thoracic spine (Tr. 196-197).

On October 2, 2007, an MRI of Plaintiff's cervical spine revealed: (1) disc protrusion; (2)

neural foraminal narrowing;[10] (3) mild spinal stenosis;[11] (4) disc herniation; (5) degenerative

disc disease; (6) disc desiccation;[12] and (7) annular disc bulging (Tr. 219).  An MRI of Plaintiff's

---

[8]Myofascitis is the "inflammation of a muscle and its fascia, particularly of the fascial insertion of muscle to bone."  *See Dorlands Illustrated Medical Dictionary*, 1241 (31st Ed. 2007).

[9]Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding ligaments and connective tissue, sometimes with pain or paresthesia radiating along the upper limbs as a result of pressure on the nerve roots."  *See Dorlands Illustrated Medical Dictionary*, 1780 (31st Ed. 2007).

[10]"Foraminal narrowing . . . is a condition of the spine that can cause pain and other symptoms resulting from spinal nerve compression.  At every level of the spine, a pair of nerve roots exit the spinal cord through small openings called foramina[.] Narrowing . . . occurs when the space available for the nerve roots to pass is reduced.  While narrowing of the foraminal canals does not necessary produce symptoms, if a nerve root is irritated or compressed, it can cause pain that radiates along the length of the nerve, as well as tingling, numbness, or weakness within the muscle group innervated by the affected nerve."  *See* http://www.laserspineinstitute.com/back_problems/foraminal_narrowing/ (last visited June 13, 2013).

[11]"Spinal stenosis is a narrowing of the open spaces within [the] spine, which can put pressure on your spinal cord and the nerves that travel through the spine."  *See* http://www.mayoclinic.com/health/spinal-stenosis/DS00515 (last visited June 13, 2013).

[12]Disc desiccation means that the discs do not have as much water as healthy discs.  *See* http://www.spine-health.com/conditions/degenerative-disc-disease-diagnosis (last visited June 13, 2013).

lumbar spine revealed annular disc bulging with a small annular tear[13] and neural foraminal narrowing (Tr. 221).

Plaintiff began physical therapy at the Rehabilitation Institute of Michigan on December 18, 2007.  Her progress was limited, because Plaintiff was distracted by lights, noises and other patients.  The Rehabilitation Institute discharged Plaintiff due to poor attendance (Tr. 275).

On December 19, 2007, Plaintiff continued to report neck and lower back pain as well as discomfort in her left shoulder.  Her pain was worse with movement.  On examination, Dr. Pollina concluded that Plaintiff's neck range of motion was mildly limited; she had mild-to-moderate restriction in her left shoulder range of motion; and, she could only bend 40 degrees and extend 10 degrees.  Dr. Pollina diagnosed Plaintiff with: (1) cervical disc herniation; (2) left shoulder rotator cuff and bicipital tendinitis;[14] and (3) thoracic and lumbar strain.  Dr. Pollina recommended that Plaintiff remain off work on "total disability" (Tr. 253-254).

On December 27, 2007, Plaintiff could not raise her left arm; her gait was slow; and, she had trouble walking on her toes and heels, and tandem walking[15] (Tr. 228).

A February 1, 2008 examination showed Plaintiff had restricted range of motion in her lumbar and cervical spine (Tr. 275).

On February 7, 2008, Plaintiff reported discomfort in her neck and pain in her left shoulder.  On examination, Dr. Pollina concluded that Plaintiff's neck range of motion was

---

[13]An annular tear is a tear into the outer annulus of the disc space.  *See* http://www.spine-health.com/conditions/degenerative-disc-disease-diagnosis (last visited June 13, 2013).

[14]Bicipital tendinitis is an inflammation of the biceps tendon and a common cause of shoulder pain.  *See* http://emedicine.medscape.com/article/96521-overview (last visited June 13, 2013).

[15]Tandem walking requires "asking [a] patient to walk a straight line while touching the heel of one foot to the toe of the other with each step."  *See* http://www.neuroexam.com/neuroexam/content.php?p=38 (last visited June 19, 2013).

mildly limited.  She diagnosed Plaintiff with: (1) cervical disc herniation; (2) bicipital tendinitis; and (3) thoracic and lumbar strain.  Dr. Pollina recommended that Plaintiff not return to work for an additional eight weeks (Tr. 251-252).

On April 2, 2008, Plaintiff reported pain in her neck and left shoulder.  Dr. Pollina again concluded that Plaintiff's neck and lumbar spine range of motion were mildly limited, and Plaintiff could only abduct her left shoulder to 90 degrees (Tr. 249-250).  Dr. Pollina recommended that Plaintiff not return to work for eight more weeks.  She diagnosed Plaintiff with: (1) cervical disc herniations; (2) bicipital and supraspinatus tendinitis;[16] and (3) thoracic and lumbar strain.  Plaintiff continued to have these diagnoses on April 23, 2008 (Tr. 247, 250).

An MRI of Plaintiff's left shoulder was performed on April 19, 2008.  Javier Beltran, M.D. found a small medium grade articular surface partial tear of the distal supraspinatus tendon.  There was no muscular atrophy,[17] and only minimal joint effusion[18] (Tr. 272).

On April 21, 2008, an examination revealed minimal arthritis in Plaintiff's left shoulder with calcific tendinitis[19] (Tr. 273).  Two days later, Plaintiff reported neck and upper back pain that increased with reaching; dressing; carrying grocery bags; or looking over her shoulder while driving and doing household chores (Tr. 269).

---

[16]Supraspinatus tendinitis is also known as rotator cuff tendinitis, and the primary symptom is shoulder pain.  *See* http://www.livestrong.com/article/213729-supraspinatus-tendonitis-symptoms/ (last visited June 13, 2013).

[17]"Muscle atrophy is the wasting or loss of muscle tissue."  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003188.htm (last visited June 13, 2013).

[18]Joint effusion is "increased fluid in [the] synovial cavity of a joint."  *See* http://www.medilexicon.com/medicaldictionary.php?t=28079 (last visited June 13, 2013).

[19]Calcific tendinitis "is a condition that causes the formation of a small, usually about 1-2 centimeter size, calcium deposit within the tendons of the rotator cuff."  *See* http://orthopedics.about.com/od/rotatorcuff/a/calcific.htm (last visited June 13, 2013).

Plaintiff's neck pain improved in May of 2008: her ability to dress and groom herself increased 25% (Tr. 267).

On June 5, 2008, Plaintiff reported neck pain, left shoulder pain, and lower back pain (Tr. 245). On examination, Dr. Pollina determined that Plaintiff's range of motion in her left shoulder was moderately restricted. Dr. Pollina diagnosed Plaintiff with: (1) cervical strain and disc herniations; (2) tendinitis and rotator cuff tear; and (3) thoracic and lumbar strain (Tr. 245-246). She recommended that Plaintiff remain off work for an additional eight weeks (Tr. 361).

On June 20, 2008, Suchetha Pandva, P.T., M.S., P.E.S., reported that Plaintiff had limited functional tolerance with reaching, driving, looking over her shoulder while driving, doing household chores, walking, ascending stairs, prolonged sitting, grocery shopping, and performing activities of daily living and functional activities at chest height and above (Tr. 266).


On July 9, 2008, Cezar Cabrera Jr., P.T.A., indicated that Plaintiff's report of constant pain with activities of daily living and prolonged standing and standing was inconsistent with the clinical objective findings (Tr. 264).

On July 22, 2008, Plaintiff reported pain in her left shoulder, neck and lower back. Dr. Pollina concluded that Plaintiff's range of motion in her left shoulder was moderately restricted. She diagnosed Plaintiff with: (1) cervical strain and disc herniations; (2) bicipital and supraspinatus tendinitis; and (3) thoracic and lumbar strain. She recommended that Plaintiff increase her activity (Tr. 243).

On August 14, 2008, Plaintiff complained of pain in her thoracic and lumbar spine, and Dr. Pollina diagnosed Plaintiff with acute thoracolumbar strain (Tr. 242).

On August 28, 2008, Plaintiff remained off work on "total disability." Her pain lessened with rest, and increased when she moved her left arm. On examination, Dr. Pollina found

-12-

Plaintiff had moderate left cervical and shoulder muscle spasms, and severely limited range of motion in the neck.  Dr. Pollina diagnosed Plaintiff with:  (1) cervical strain and disc herniations; (2) bicipital and supraspinatus tendinitis; (3) thoracic and lumbar strain; and (4) left shoulder myofascitis.  She recommended that Plaintiff not return to work for an additional six weeks (Tr. 240-241).

On September 6, 2008, September 10, 2008, and September 27, 2008, Plaintiff continued to report pain in her neck, left shoulder and lower back.  Dr. Pollina performed acupuncture treatment (Tr. 237-239).

On October 4, 2008, Plaintiff reported that she felt better and could move around easier, but she still had pain in her neck and lower back.  The pain decreased with medication and increased with activity.  Dr. Pollina diagnosed Plaintiff with cervical strain and disc herniations, myofascitis in her shoulder, and thoracic and lumbar myofascitis (Tr. 236).

On November 26, 2008, Plaintiff complained of arthritis in her neck and back that increased when she lifted objects, pushed, pulled, and reached (Tr. 374).  Dr. Cynthia Shelby-Lane, M.D. found Plaintiff had mild tenderness to palpation of the low lumbar area; and while lying down, Plaintiff could only raise her leg to 50 degrees (Tr. 376).  Dr. Shelby-Lane found that Plaintiff could: (1) occasionally lift 10 or 15 pounds; (2) stand and walk four hours in an eight-hour workday; (3) sit less than six hours in an eight-hour workday (with the ability to change positions); (4) use her upper extremities for simple grasping, reaching, pushing, pulling, and fine manipulation; and (5) operate foot and leg controls bilaterally (Tr. 377).  Brian Neu – a consultative examiner for the Social Security Administration ("SSA") – found that Dr. Shelby-Lane's standing, walking and sitting restrictions were unsupported (Tr. 383).

William Joh, M.D. completed a Physical RFC on December 22, 2008.  He found that Plaintiff could perform light work with the following limitations: (1) occasionally lift 20 pounds;

(2) frequently lift 10 pounds; (3) stand, sit and walk for six hours in an eight-hour workday; (4) only use her left shoulder frequently; and (5) avoid frequently using her left arm to lift objects above her shoulder and perform overhead work (Tr. 403, 405).  Dr. Joh reported that his conclusion regarding Plaintiff's ability to lift, stand, walk, and sit were based on the fact that Plaintiff's "[a]llegation[s] seem[ed] out of proportion" (Tr. 403).

### c.     Plaintiff's Headaches and Dizziness

Plaintiff experienced headaches from the car accident in March of 2007.  On June 21, 2007, Plaintiff reported that her headaches were slightly relieved by taking Tylenol #3, and she only experienced dizziness 2-3 times per week (i.e., a spinning sensation that lasted for two minutes) (Tr. 231).  On June 30, 2007, Plaintiff reported daily headaches and light-headedness (Tr. 229).

Plaintiff reported frequent headaches on December 19, 2007, December 27, 2007, and February 7, 2008 (Tr. 228, 251, 253).

On December 18, 2007, Plaintiff reported dizziness when she squatted; carried objects; and sat and stood up for extended periods of time (Tr. 274).

Plaintiff reported that her headaches improved in June of 2008, and her dizziness decreased in May of 2008; her headaches returned on the left side in August of 2008 (Tr. 225, 240, 267).  And, Plaintiff reported increased headaches on July 21, 2010 (Tr. 455).  Plaintiff's diagnoses included the following:

(1)     June 21, 2007 – Dr. Sul – *possible closed head injury, cerebral concussion, dizziness and vertigo* (Tr. 232);

(2)     June 30, 2007 – Dr. Sul – *closed head injury and cerebral concussion* (Tr. 229);

(3)     July 9, 2007 – Dr. Katz – *post-traumatic headaches and dizziness* (Tr. 198-199);

(4)     August 29, 2007, December 19, 2007, and February 7, 2008 – Dr. Pollina – *probable closed head injury* (Tr. 251, 254-255);

(5)     April 2, 2008, April 23, 2008, and October 4, 2008 – Dr. Pollina – ***post-traumatic headaches*** (Tr. 236, 247, 250);

(6)     June 5, 2008 – Dr. Pollina – ***post-traumatic headaches (that were improved) and closed head injury*** (Tr. 246, 356);

(7)     July 22, 2008 – Dr. Pollina – ***post-traumatic headaches (that were improving)*** (Tr. 243);

(8)     August 28, 2008 – Dr. Pollina – ***post-traumatic headaches*** (Tr. 240); and

(9)     February 25, 2009 – Eric C. Amberg, Ph.D., F.I.P., B.C.F.E. – ***closed head injury*** (Tr. 412).

### d.     Plaintiff's Mental Impairments

Between 2007 and 2010, Plaintiff experienced depression; anxiety; problems with memory and focus; a slow thought process; irritability; agitation; mood swings; flight of ideas; poor concentration; anxiousness; feelings of anger, frustration, hopelessness and helplessness; crying spells; sadness; low self esteem; lack of motivation; low energy; paranoia; auditory hallucinations; and suicidal and homicidal ideation (Tr. 225, 228, 232, 243, 247-250, 253, 255, 259, 292, 368, 372, 374, 377, 415-416, 420, 422, 426, 428, 435, 443, 445, 451, 455).  Her diagnoses included the following:

(1)     February 27, 2007 – ***depression*** (Tr. 292);

(2)     June 6, 2007 – Dr. Pollina – ***anxiety and depression*** (Tr. 259);

(3)     June 30, 2007 and June 12, 2008 – Dr. Sul – ***possible post-traumatic stress syndrome*** (Tr. 225, 229);

(4)     July 9, 2007 – Dr. Katz – ***memory loss*** (Tr. 199);

(5)     March 28, 2008 – Yarlagadda Prasad, M.D. – ***adjustment disorder with depressed mood*** (Tr. 346);

(6)     April 23, 2008 – Dr. Pollina – ***anxiousness with decreased focus*** (Tr. 247);

(7)     June 5, 2008 – Dr. Pollina – ***depression*** (Tr. 246);

(8)     June 20, 2008 – ***adjustment disorder with improved depression and mood, and increased socialization*** (Tr. 364);

(9)     August 28, 2008 – Dr. Pollina – ***depression*** (Tr. 240);

(10)    November 26, 2008 – F. Qadir, M.D. – ***major depression*** (Tr. 370);

(11)    December 10, 2008 – Colin F. King (a consultative examiner for the SSA) – ***memory impairment, mood disturbance, and major depressive disorder*** (Tr. 389, 391);

(12)    February 25, 2009 – Eric C. Amberg, Ph.D., F.I.P., B.C.F.E. – ***adjustment disorder with mixed emotional features*** (Tr. 412); and

(13)    June 9, 2010 – Rohini K. Reddy, M.D. – ***severe major depressive disorder, recurrent with psychotic features*** (Tr. 449).

During an interview on August 22, 2008, Social Security representative B. Glodowski stated that Plaintiff had a "hard time remembering dates and other items" (Tr. 139).

On November 26, 2008, Dr. Qadir evaluated Plaintiff and completed a psychiatric report (Tr. 368-370). Dr. Qadir found that Plaintiff had trouble performing simple manual labor jobs due to depression, short-term memory problems, and trouble concentrating (Tr. 370).

On December 10, 2008, Mr. King concluded that Plaintiff was moderately limited in her ability to: (1) perform activities of daily living; and (2) maintain concentration, persistence or pace (Tr. 398). She was mildly limited in her ability to maintain social functioning (Tr. 398).

On December 14, 2008, Mr. Neu wrote:

[Plaintiff] does have a[] [medically determinable impairment] that can reasonably be expected to cause her symptoms. [Plaintiff's] [activities of daily living] do show some restrictions in her ability to dress and interact with others, however, her limitations appear to be more due to her pain from the [motor vehicle accident] in 2007 than any psychological difficulties, as [Plaintiff] is extremely frustrated that her pain has not improved since the accident.

(Tr. 372).

James Tripp, ED.D. completed a Mental RFC on December 17, 2008. Dr. Tripp determined that Plaintiff was moderately limited in her ability to: (1) understand and remember

detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; and (4) interact appropriately with the general public (Tr. 384-385). Dr. Tripp concluded that Plaintiff was not precluded from performing simple, unskilled work activities (Tr. 386).

### 3.    Vocational Expert

The ALJ asked a VE to assume a hypothetical individual of Plaintiff's age, education and past work experience. The individual could perform light work but could only occasionally reach overhead and lift objects above shoulder level. The individual also has mental limitations "consistent with Exhibit 9F" [i.e., moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; and (4) interact appropriately with the general public] (Tr. 55-56, 384-385). The VE testified that such an individual could not perform Plaintiff's past relevant work (Tr. 56). But, the individual could perform work as a laundry sorter or classifier[20] (1,000 jobs available in Georgia; 10,000 jobs available in the national economy),[21] cafeteria attendant[22] (1,000 jobs available in Georgia; 100,000 jobs available in the national economy) or cashier II[23] (Tr. 56-57). At the sedentary exertional level, the individual could perform work as a surveillance system monitor (Tr. 57). The VE also testified that the individual could still perform these jobs if she experienced mild to moderate pain (Tr. 58).

---

[20]Dictionary of Occupational Titles ("DOT") code 361.687-014 (Tr. 56).

[21]Plaintiff lived in Georgia at the time of the administrative hearing.

[22]DOT code 311.677-010 (Tr. 57).

[23]The VE testified that the DOT code associated with the cashier II job is 311.462-010 (Tr. 57). However, a review of the DOT reveals the correct code is 211.462-010. *See* http://www.occupationalinfor.org/21/211462010.html (last visited June 14, 2013).

According to the VE, the individual would be precluded from work if she: (1) could only work for small increments of time – with breaks between increments – for a total of four hours of work per day; (2) had moderately severe to severe chronic pain; and (3) had depression or anxiety that interfered with her ability to maintain attention, concentration, persistence and pace such that she could not complete an eight-hour work day or a 40-hour work week (Tr. 58-59).

### D.    Plaintiff's Claims of Error

#### 1.    Medical Source Statement from Plaintiff's Treating Physician

Plaintiff argues that the ALJ erred by failing to request a medical source statement from Plaintiff's treating physician – Dr. Pollina – regarding her "ability, despite [her] impairment(s), to do work-related activities such as sitting, standing, walking, lifting carrying, handling objects, hearing, speaking, and traveling[.]" *See* 20 C.F.R. §416.913(c)(1).[24]

Because Plaintiff was not represented by counsel at the administrative hearing, the ALJ had a heightened duty to fully develop the record. *See Lashley v. Sec. of HHS*, 708 F.2d 1048, 1051 (6th Cir. 1983). Specifically, the ALJ was required to "scrupulously and conscientiously probe into, inquire of, and explore the relevant facts." *Id.* (citation omitted). As part of this duty, the regulations require the ALJ to request a medical source statement. *See* 20 C.F.R. §404.1513(b)(6) ("*we will* request a medical source statement about what [Plaintiff] can still do despite [her] impairment(s)") (emphasis added). But, the regulations further state that "the lack of the medical source statement will not make the report incomplete." *Id.*; *see also Mayes v. Massanari*, 276 F.3d 453, 459-460 (9th Cir. 2001) ("[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to

---

[24]The ALJ requested medical records from Dr. Pollina, but he omitted from the request a medical source statement (Tr. 235).

allow for proper evaluation of the evidence").  Accordingly, "remand is not always required

when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains

sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."

*Tankisi v. Comm'r of Soc. Sec.*, No. 12-1398-cv, 2013 WL 1296489 at *4 (2nd Cir. April 2,

2013) (citing *Moser v. Barnhart*, 89 F. App'x 347, 348 (3rd Cir. 2004); *Scherschel v. Barnhart*,

72 F. App'x 628, 630 (9th Cir. 2003); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).

     The medical evidence in this case is extensive.  It includes the following assessments of

Plaintiff's limitations:

> (1)    Dr. Katz found that Plaintiff cannot: (a) lift more than 10 pounds; (b) perform any
> repetitive bending, pushing, pulling, squatting or reaching overhead; and (c) sit or
> stand for long periods of time (Tr. 200);
>
> (2)    Dr. Shelby-Lane found that Plaintiff could: (a) occasionally lift up to 10 or 15
> pounds; (b) stand and walk four hours in an eight-hour workday; (c) sit less than
> six hours in an eight-hour workday (with the ability to change positions); (d) use
> her upper extremities for simple grasping, reaching, pushing, pulling, and fine
> manipulation; and (e) operate foot and leg controls bilaterally (Tr. 377); and
>
> (3)    Dr. Joh found that Plaintiff could:  (a) occasionally lift 20 pounds; (b) frequently
> lift 10 pounds; (c) stand, sit and walk for six hours in an eight-hour workday; (d)
> only use her left shoulder frequently; and (e) use her left arm to lift objects above
> her shoulder and perform overhead work less than frequently (Tr. 403, 405).

(Tr. 21).  Because the medical record was voluminous, the medical evidence unambiguous, and

the record adequate to permit an informed finding by the ALJ, there was no error in the ALJ's

failure to request a medical source statement from Dr. Pollina.

### 2.    The ALJ's RFC Determination

     Plaintiff next argues that the ALJ's RFC determination is unsupported by substantial

evidence because the ALJ: (1) erred in affording "great weight" to Dr. Joh and Dr. Tripp's

opinions; (2) erred in failing to afford the proper weight to Dr. Qadir and Dr. Shelby-Lane's

opinions; and (3) failed to accurately consider limitations stemming from her hidradenitis

suppurativa.

The Sixth Circuit has instructed ALJs on how to assess opinions from nonexamining

sources like Dr. Joh and Dr. Tripp and nontreating sources like Dr. Qadir and Dr. Shelby-Lane:

> [O]pinions from nontreating and nonexamining sources are never assessed for
> "controlling weight."  The Commissioner instead weighs these opinions based on
> the examining relationship (or lack thereof), specialization, consistency, and
> supportability, but only if a treating-source opinion is not deemed controlling.  20
> C.F.R. § 404.1527(c).  Other factors "which tend to support or contradict the
> opinion" may be considered in assessing any type of medical opinion.  *Id.* §
> 404.1527(c)(6).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  The ALJ concluded that

Dr. Joh and Dr. Tripp's opinions were entitled to "great weight":

> [g]reat weight is given to the comprehensive and specific function-by-function
> assessments of the state agency specialists.  James Tripp, Ed.D., reviewed
> [Plaintiff's] mental health history and concluded she was moderately limited in
> her abilities to understand, remember and carry out detailed instructions, to
> maintain attention and concentration for extended periods and to interact
> appropriately with the general public.  William Joh, M.D., considered [Plaintiff's]
> physical capacity to work and reviewed her clinical findings and allegations prior
> to determining she retained the ability to perform light work so long as she
> avoided frequent overhead reaching.  These opinions are consistent with the
> longitudinal medical record.

(Tr. 21).

### a.      *Dr. Joh's Opinion Regarding Plaintiff's Physical RFC*

This Magistrate Judge finds the ALJ failed to discuss the supportability factor when

assessing Dr. Joh's opinion.  *See* 20 C.F.R. §404.1527(c)(3):

> [t]he more a medical source presents relevant evidence to support an opinion,
> particularly medical signs and laboratory findings, the more weight we will give
> that opinion.  The better an explanation a source provides for an opinion, the more
> weight we will give that opinion.  Furthermore, because nonexamining sources
> have no examining or treating relationship with [Plaintiff], the weight we will
> give their opinions will depend on the degree to which they provide supporting
> explanations for their opinions.  We will evaluate the degree to which these

> opinions consider all of the pertinent evidence in [Plaintiff's] claim, including
> opinions of treating and other examining sources.

The only rationale for Dr. Joh's opinion that Plaintiff could perform light work was that

Plaintiff's allegations *seemed* out of proportion (Tr. 403). Dr. Joh did not "[c]ite the specific

facts upon which [his] conclusion [was] based" or "explain how and why the evidence

support[ed] [his] conclusions" (Tr. 403, 405). In addition, Dr. Joh indicated that a treating or

examining source statement regarding Plaintiff's physical capacities was in the file and the

statement was significantly different from his findings; but, when asked to explain why the

treating or examining source's statement was not supported by the evidence in the file (including

the source's name and date of the statement), Dr. Joh simply wrote "[n]ot substantiated" (Tr.

408). This case should be remanded to the ALJ for a discussion on whether Dr. Joh's opinion

should still be afforded "great weight" given the apparent lack of supportability.

### b.    Dr. Tripp's Opinion Regarding Plaintiff's Mental RFC

Plaintiff also argues that the ALJ did not consider the fact that Dr. Tripp's opinion that

Plaintiff could perform "simple, unskilled work activities," (Tr. 386) was inconsistent with Dr.

Qadir's opinion that Plaintiff "will have problems attending to simple manual labor jobs" (Tr.

370).

Plaintiff's argument ignores the fact that the ALJ discounted Dr. Qadir's opinion because

he "did not specify the nature or degree of [Plaintiff's] difficulty [with performing simple

manual labor jobs]" (Tr. 21). This Magistrate Judge finds the ALJ did not err by failing to

address the consistency factor outlined in 20 C.F.R. §404.1527(c)(4).

### c.    Dr. Qadir's Opinion Regarding Plaintiff's Mental RFC

The ALJ concluded as follows regarding Dr. Qadir's opinion:

> [i]n November 2008, consulting examiner F. Qadir, M.D., concluded from an
> interview that [Plaintiff] would have problems attending to simple manual labor

tasks, but did not specify the nature or degree of such difficulty.  *The [RFC],
however, recognizes that [Plaintiff's] ability to maintain concentration and
attention is more than mildly limited.*

(Tr. 21) (emphasis added).  While the ALJ discounted Dr. Qadir's opinion that Plaintiff "will

have problems attending to simple manual labor jobs," it appears that he adopted the reasoning

underlying the opinion:  that Plaintiff has trouble with short-term memory and concentration (Tr.

370).  Plaintiff says it is unclear how the ALJ adopted Dr. Qadir's reasoning, but concluded in

his RFC determination that Plaintiff "can understand, remember and carry-out simple tasks with

no limitations" (Tr. 18).

A review of the ALJ's decision – in its totality – reveals that in reaching his RFC

determination, the ALJ read the reasoning underlying Dr. Qadir's opinion (i.e., that Plaintiff had

trouble with short-term memory and concentration) together with Dr. Tripp's opinion that

Plaintiff could perform "simple, unskilled work activities."  As such, the ALJ's decision should

not be disturbed on appeal.

### d.      *Dr. Shelby-Lane's Opinion Regarding Plaintiff's Physical RFC*

The ALJ concluded as follows regarding Dr. Shelby-Lane's opinion:

examiner Cynthia Shelby-Lane, M.D., concluded [Plaintiff] could occasionally
lift 15 pounds (comparable to the requirements of light work, which contemplate
occasional lifting of 10-20 pounds).  Although Dr. Shelby-Lane imposed no
restrictions on [Plaintiff's] use of her arms for reaching, the [RFC] as adopted is
more restrictive due to mild tendinitis.  The restriction to standing or walking no
more than [four] hours in an [eight]-hour workday is not adopted because such
restriction is inconsistent with Dr. Shelby-Lane's unremarkable clinical findings
in the examination.

(Tr. 21).

This Magistrate Judge finds the ALJ did not err in his conclusion that Dr. Shelby-Lane's

opinion – that Plaintiff was limited to standing and walking no more than four hours – was

inconsistent with her findings during the examination.  Although Plaintiff had mild tenderness to

-22-

palpation of the low lumbar area and she could only raise her leg to 50 degrees lying down (Tr. 376), Dr. Shelby-Lane noted that Plaintiff did not use a walking aid; her gait and stance were normal; and, she could tandem walk, heel walk and toe walk without difficulty (Tr. 376). Further, Mr. Neu opined that Dr. Shelby-Lane's standing and walking restrictions were unsupported (Tr. 383).

However, the ALJ did err in his conclusion that Plaintiff's ability to *occasionally* lift 10 or 15 pounds was consistent with the requirements of light work. "The regulations define light work as lifting no more than 20 pounds at a time with *frequent* lifting or carrying of objects weighing up to 10 pounds." SSR 83-10 (emphasis added). This case should be remanded to the ALJ to explain how Plaintiff could perform the lifting requirement of light work given Dr. Shelby-Lane's opinion.

This case should also be remanded to the ALJ for consideration of Dr. Shelby-Lane's opinion that Plaintiff could sit less than six hours in an eight-hour workday (with the ability to change positions). A finding that Plaintiff cannot sit for six hours – coupled with the requirement that she change positions – means she may be unable to perform the requirements of light, unskilled work. *See* SSR 83-10 ("the full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday"); *see also* SSR 83-12 ("[u]nskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will"); SSR 96-9p (where the need to alternate sitting and standing "cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded").

   *e.*  ***Plaintiff's Need to Take Breaks Due to Hidradenitis Suppurtiva***

In determining Plaintiff's RFC, the ALJ noted that "[a] statement from March 2007 related to short-term hidradenitis suppurtiva is not material to an assessment of the effect of [Plaintiff's] long-term severe impairments upon her ability to perform vocational tasks" (Tr. 21). But, the regulations require the ALJ to "consider the limiting effects of all [Plaintiff's] impairments, even those that are not severe, in determining [her] [RFC]." 20 C.F.R. §404.1545(e).

This case should be remanded to the ALJ for a discussion of Plaintiff's hidradenitis suppurtiva, including the need to take extra breaks.

### 3.    Plaintiff's Credibility

The ALJ discussed the factors outlined in 20 C.F.R § 404.1529(c)(3) that must be considered when assessing the credibility of Plaintiff's statements:

(i)      Your daily activities;

(ii)     The location, duration, frequency and intensity of your pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v)     Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi)    Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15-20 minutes every hour, sleeping on a board, etc.); and

(vii)   Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

(Tr. 19-21).  With regard to the first factor, the ALJ stated "[Plaintiff] remains capable of caring for her children, can prepare meals, and recently began exercising at a local gym (including use of the treadmill and aquatic exercise)" (Tr. 19).

The ALJ's description of Plaintiff's daily activities "not only mischaracterizes [Plaintiff's] testimony regarding the scope of her daily activities, but also fails to examine the physical effects coextensive with their performance." *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007). Specifically, Plaintiff reported that her roommate helps her care for her children,[25] she only cooks weekly, and she does not have enough strength to cook more frequently due to her back pain (Tr. 154-155). In addition, Plaintiff only exercised to improve her mobility (Tr. 47). This case should be remanded to the ALJ for further discussion on Plaintiff's daily activities.

But, Plaintiff's argument that the ALJ erred in failing to consider her MRI results – which arguably support Plaintiff's credibility – lacks merit. There is no requirement that the ALJ discuss every piece of evidence in the administrative record, *See Kornecky*, 167 F. App'x at 508, and the ALJ accounted for Plaintiff's shoulder pain by restricting the use of her left shoulder when reaching or working overhead (Tr. 20).

### 4.      Plaintiff's Right to Cross-Examine the VE

Before the ALJ began the administrative hearing, he informed Plaintiff about the benefits of representation. The following colloquy – in relevant part – occurred between the ALJ and Plaintiff:

| | |
|---|---|
| ALJ: | Your case has been assigned to me and before we go any further, I need to explain your rights of representation so that you can make an informed decision concerning your rights. |
| CLMT: | Uh-huh. |
| ALJ: | And what you need to know is that every Claimant that appears before me does have a right to be represented. And you can be represented either by an attorney or a non-attorney representative, someone I call a paralegal. And some of the possible benefits of |

---

[25]In July of 2007, Dr. Katz restricted Plaintiff from taking care of her children (Tr. 200).

representation are that an attorney or a non-attorney representative can help obtain any evidence, medical or otherwise, that show any limitations that you have, help prepare your testimony, or the testimony of any witnesses on your behalf, and in adult cases, I have a Vocational Expert that testifies. Dr. Blakeman (PHONETIC) here is with me today. He's a Vocational Expert and he's been testifying in cases today. And, . . . like I said, in adult cases[,] I always have a Vocational Expert. And what a Vocational Expert does is first testify about the work that a Claimant's done in the past and the Expert will classify that work as to its exertional level and skill level. And then second and most importantly, they answer [a] hypothetical question. And what a hypothetical question is is I'll pose to the Vocational Expert a hypothetical or imaginary person who has certain limitations. And I'll say with those limitations, I'll ask a series of questions, and say given those limitations could that hypothetical person do any of the work that the Claimant's done in the past. And they'll say yes or no. And I'll say if they can't do work they've done in the past, would there be other jobs that exist in the national economy that the hypothetical person could do with those limitations. And if the Vocational Expert says yes, then they'll[sic] give examples of those jobs and then numbers of those jobs in the national economy. *Now one other possible benefit of representation is that a representative or attorney can cross-examine any of the testimony of a Vocational Expert.* So those are some of the possible benefits of representation.

(Tr. 29-30) (emphasis added). After the VE's testimony, the ALJ said:

Q: Ms. Glenn, what I did was walk Dr. Blakeman through a series of scenarios. And in . . . the first hypothetical, that hypothetical person could do light work and . . . had some mental limitations that basically limited them[sic] to unskilled work, simple one, two step tasks. And . . . he said under that scenario, that the hypothetical person couldn't do any work that you've done in the past, but there were other jobs that exist out there that could be done with those limitations. And . . . he gave some examples of those. And then the second hypothetical person, I said if the hypothetical person was limited to only jobs done sitting for most of the day, he said there was only one job that he could think of that would accommodate those limitations at the sedentary level and . . . he named that job, the surveillance system monitor. And then the third hypothetical person . . . was one which the hypothetical person couldn't sustain work activity for a full [eight] hours a day, 40 hours a week, somewhat similar to . . . where[sic] you're saying about the . . . mopping where you had to stop and rest, you could only do it, you know, about 10 minutes or so then you had to stop and rest. And he said if the hypothetical person had those kind of limitations, there are no jobs out there that would accommodate that. And,

> similarly, if the hypothetical person were experiencing moderately severe
> to severe pain, there are no jobs that would accommodate that. He's not
> offering an opinion on the ultimate issue in your case. It would be my job
> to decide, under the facts of your case, whether the facts more closely fall
> in the first, second, or third scenario. Does that make sense?

A:     Yes.

(Tr. 59-60). The transcript of the hearing confirms that Plaintiff – proceeding *pro se* – did not

receive an invitation to cross-examine the VE. Plaintiff says this was error.

The social security regulations require that the ALJ afford Plaintiff an opportunity to

question the VE: "[t]he administrative law judge may ask the witnesses any questions material to

the issues and *shall allow* the parties or their designated representatives to do so." 20 C.F.R.

§404.950(e) (emphasis added); *see also e.g., Haddock v. Apfel*, 196 F.3d 1084, 1090 (10th Cir.

1999) ("[c]laimants have a right to cross-examine vocational experts as a part of procedural due

process") (citation omitted); *Howe v. Astrue*, No. 12-93, 2013 WL 593975 at *3 (W.D. Pa. Feb.

14, 2013) ("a claimant has the right to cross-examine vocational experts as a part of procedural

due process") (citing *Gauthney v. Shalala*, 890 F.Supp. 401 (E.D. Pa. 1994)). But, to

demonstrate a due process violation, there "must be a showing of prejudice." *Carter v. Astrue*,

No. 3:10-cv-22-J-TEM, 2011 WL 4502024 at *7 (M.D. Fla. Sept. 28, 2011) (quoting *Gordon v.

Astrue*, 249 Fed. Appx. 810, 813 (11th Cir. 2007)).

Plaintiff says she would have asked the VE whether – in identifying jobs Plaintiff could

perform despite the limitations provided by the ALJ in the hypothetical question – he considered

the fact that Plaintiff was moderately limited in her ability to interact appropriately with the

general public. Plaintiff does not believe the VE fully understood the evidence in "Exhibit 9F"

that he was supposed to consider (Dkt. No. 19 at 9-10 CM/ECF). This Magistrate Judge agrees.

In response to the hypothetical question, the VE testified as follows:

-27-

Light work and work consistent with the RFC in Exhibit 9F, would have been work that would be uncomplicated with no exertion over 20 pounds, and certainly, frequently 10.  And such jobs that could accommodate the . . . conditions in that hypothesis in that particular Exhibit would be . . . jobs such as a [laundry] sorter or classifier job.  It's light, unskilled.  It's performed at a table, you do not have to do any overhead lifting.  You could do the job virtually with one hand, but having two hands, even with his scotching movement or assisting movement would be acceptable on that job. . . .  And the other job that would accommodate that with no overhead or just abbreviated use or occasional [use] of the left . . . hand, would be that of a cafeteria attendant.  That's a job where there's no repetitive or frequent use [of hands], other than to grip a tray or something to assist a customer to . . . where they would be partaking of the food[] they would get in the cafeteria, or other eating establishment where they'd be attending.  It's a light unskilled job. . . .  Another light unskilled job which would accommodate the conditions of the hypothesis would be that of a cashier who performs cashiering function[s] in a kiosk or a booth.  It's an unskilled job.

(Tr. 56-57).  While the ALJ attempted to formulate a hypothetical question that adequately accounted for Plaintiff's impairments – and included in his RFC determination that Plaintiff was "moderately limited in her ability to . . . interact appropriately with the general public" (Tr. 18)[26] – it is unclear whether the VE accounted for Plaintiff's limitation in her ability to interact with the general public.  Indeed, the VE discussed the lifting requirements of the cashier II,[27] cafeteria

---

[26]The fact that the ALJ included in his RFC determination that Plaintiff is moderately limited in her ability to interact with the general public does not mean the ALJ limited Plaintiff's contact with the general public.  For example, the ALJ's RFC determination did not limit Plaintiff to only occasional work in proximity to co-workers and supervisors, or only direct contact with the public occasionally (or less than occasionally).

[27]The cashier II job requires interaction with the general public: (1) "[r]eceives cash from customers or employees"; (2) "issues receipts or tickets to customers"; (3) "[m]ay give cash refunds or issue credit memorandums to customers for returned merchandise"; (4) "[m]ay receive money, make change, and cash checks for sales personnel on same floor" ; and (5) "[m]ay make change for patrons at places of amusement other than gambling establishments."  *See* http://www.occupationalinfo.org/21/211462010.html (last visited June 14, 2013).

attendant,[28] and laundry sorter or classifier jobs[29] – and the fact that the identified jobs were uncomplicated and unskilled – but, he did not mention the level of interaction with the general public that those jobs required.

The ALJ relied on the VE's testimony in finding Plaintiff was not disabled.  *See* Tr. 23 ("[b]ased on the testimony of the [VE], the undersigned concludes that, considering [Plaintiff's] age, education, work experience, and [RFC], [Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  A finding of "not disabled" is therefore appropriate[.]").  Accordingly, this case should be remanded to allow Plaintiff the opportunity to cross-examine the VE regarding whether his testimony would be affected by an individual who was moderately limited in her ability to interact appropriately with the general public.

Plaintiff also says she would have asked the VE about inconsistencies between his testimony and the information contained in the DOT.[30]  Specifically, Plaintiff argues that it is unclear how an individual who is "moderately limited in her ability to . . . interact with the general public" could perform the cashier II job, which requires "[d]ealing with people beyond giving and receiving instructions" (Dkt. No. 19 at 9 CM/ECF).  Plaintiff's argument ignores the

---

[28]The cafeteria attendant job requires at least some interaction with the general public: the individual must "[c]arr[y] trays from food counters to tables for cafeteria patrons."  *See* http://www.occupationalinfo.org/31/311677010.html (last visited June 14, 2013).

[29]It is unclear whether the laundry sorter or classifier job requires any interaction with the general public.  *See* http://www.occupationalinfo.org/36/361687014.html (last visited June 14, 2013).

[30]The ALJ fulfilled his duty under SSR 00-4p when he inquired – on the record – as to whether or not the VE's testimony was consistent with the information provided in the DOT (Tr. 59).  Once the VE testified that his testimony was consistent, the ALJ was not required to develop the record further.  *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009).

fact that the VE also testified that she could perform work at the light exertional level as a laundry sorter or classifier, and cafeteria attendant. Even if this Magistrate Judge eliminated the cashier II job, there are still a significant number of cafeteria attendant jobs, and laundry sorter or classifier jobs available that Plaintiff could perform.[31] Still, because this Magistrate Judge believes the case should be remanded to allow Plaintiff an opportunity to cross-examine the VE about whether his testimony accounted for Plaintiff's limitation in her ability to interact with the general public, Plaintiff should also be allowed to ask about any inconsistencies between the VE's testimony and the DOT on this issue.

## IV.   CONCLUSION

Because the ALJ's determination that Plaintiff was not disabled is not supported by substantial evidence, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **GRANTED**, the Commissioner's motion for summary judgment be **DENIED**, and the case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).[32]

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28

---

[31]While the VE testified that there are only 1,000 laundry sorter or classifier jobs and 1,000 cafeteria jobs available in the state, courts have found as few as 200 jobs regionally may constitute significant work in the national economy. *See Putman v. Astrue*, No. 4:07-cv-63, 2009 WL 838155 at *3 (E.D. Tenn. March 30, 2009) (200-250 available jobs in the region and 75,000 jobs in the national economy constitutes a significant work in the national economy) (citing *Craigie v. Bowen*, 835 F.2d 56, 58 (3rd Cir. 1987) (200 jobs in region is significant number of jobs); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs in region and 80,000 nationally); *McCallister v. Barnhart*, 2004 WL 1918724 at *5 (D. Me. Aug. 26, 2004) (372 jobs regionally and 50,955 nationally)).

[32]On remand, in assessing Plaintiff's RFC, the ALJ should also consider Mr. Glodowski's note that Plaintiff had a hard time remembering dates and other items. *See* SSR 96-7 (an ALJ "must . . . consider any observations about the individual recorded by Social Security Administration (SSA) employees during interviews, whether in person or by telephone").

U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of

appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596

(6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are

advised that making some objections, but failing to raise others, will not preserve all the

objections a party may have to this Report and Recommendation.  *See McClanahan v. Comm'r*

*Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at

596-97. Objections are to be filed through the Case Management/Electronic Case Filing

(CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D.

Mich. LR 5.1. A copy of any objections is to be served upon this Magistrate Judge but this does

not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due

within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of

service of the response.  *See* E.D. Mich. LR 72.1(d)(3), (4).

s/Mark A. Randon                
Mark A. Randon
United States Magistrate Judge

Dated:  June 19, 2013

*Certificate of Service*

     *I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 19, 2013, by electronic and/or ordinary mail.*

*s/Eddrey Butts*               
*Case Manager for Magistrate Judge Randon*
